# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| SLR, a minor, by and through her parents, CAR and CDR, and CAR and CDR on their own behalf, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Cause No. 1:18-CV-315-HAB |
| ANDREW SAUL, Commissioner of SSA,[1] | ) ) ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This case comes before the Court on Defendant Andrew Saul, Commissioner of the Social Security Administration's (the "SSA"), Motion to Remand for Further Administrative Proceedings and Development under Sentence Four of 42 U.S.C. § 405(g) (the "Motion") (ECF No. 17). The Motion asks the Court to remand this matter back to the ALJ to fix what the SSA concedes are significant deficiencies in the way the proceedings below were handled. Plaintiffs object to the Motion, *see* ECF No. 19, arguing that the preliminary question on appeal, the propriety of the SSA's decision to reopen Plaintiffs' benefit determination, is an issue of law that this Court can and should decide. Instead, Plaintiffs ask this Court to remand this matter for the reinstatement of the prior award of benefits based on CDR's earnings record and to vacate the claimed overpayment. After a thorough review of the record, the Court concludes that the SSA has wholly failed to address the legal arguments advanced by Plaintiff. As a result, the Court will remand with instructions to reinstate the prior award of benefits and to vacate the SSA's claimed overpayment.

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). See also Section 205(g) of the Social Security Act, 42 USC § 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

# I. FACTS AND PROCEDURAL HISTORY

CAR, mother of SLR, has been married to CDR since July 30, 1980. SLR was born on October 21, 2003. Around the time of SLR's conception, CAR had a sexual relationship with another man, Carl, while she was in Kentucky for work.

In April 2010, CDR filed an application for Social Security retirement benefits (ECF No. 9 at 29–32) and named SLR as his child. SLR began receiving benefits as CDR's child in July 2010. In September 2014, Carl filed an application for Disability Insurance benefits (*Id*. at 37–38), and in that application, he indicated that he did not have any children. Carl amended his application on December 31, 2014 (*Id*. at 41–42), to list SLR as his child.

As part of the processing of Carl's application, an SSA representative, Rose Hatch, completed a Report of Contact (*Id*. at 49) on January 9, 2015. The Report of Contact recounted two key events. The first was a telephone call that occurred on December 31, 2014. The Report of Contact states that, during that call, both CDR and CAR stated that Carl was SLR's father.

The second event was a visit by CDR and CAR to their local SSA branch on January 9, 2015. During that visit, the Report of Contact states that CDR and CAR again identified Carl as SLR's father. They presented SLR's birth certificate which showed no father listed. While at the office, CDR signed a form stating that SLR lived in his home since birth and that he and CAR had been the only support of SLR during her lifetime.

The Report of Contact also contains statements of Carl, although it is not clear where these statements came from. According to the Report of Contact, Carl stated that he had an affair with CAR in 2003 that produced a child, SLR. Carl further stated that he was at the hospital when SLR was born. The Report of Contact ends with a question, "[W]hat is [SLR's] status as a child and is she entitled to benefits on [CDR's] record?"

On February 19, 2015, CDR sent a letter to Hatch regarding the support and living arrangements of SLR. (*Id*. at 54). According to the letter, CDR and CAR were married, but maintained separate homes. CAR and SLR would occasionally live with CDR, sometimes as much as three days a week and weekends. CDR reported that he made most significant purchases for SLR, paid school fees, provided transportation, and was "there to help with any type of need that [SLR] has." It appears that, shortly after receiving this letter, Hatch placed a note in SLR's file directing that her benefits not be reinstated because she was not the child of CDR. There is no record indicating that SLR, CDR, CAR, or Carl were contemporaneously made aware of Hatch's determination.

At some point in early June 2015, CDR and CAR returned to their local SSA branch to get an update on the status of SLR's benefits. Following that visit, a Special Determination (*Id*. at 55) was made by a different SSA employee, Melissa Lai, on June 9, 2015. Lai determined that, because CDR and CAR were married at the time of SLR's birth, SLR would be presumed to be CDR's child and benefits would be reinstated. According to Lai, "SSA is not going to reopen the prior decision that [SLR] is the child of [CDR]. This case does not meet one of the exceptions."

The next day, June 10, 2015, Hatch entered her own Special Determination. (*Id*. at 56). Relying on CDR and CAR's January 9, 2015, statements regarding Carl's status as SLR's father, the fact that SLR did not live with CDR, and the assertion that CDR "is not providing ½ support,"[2] Hatch concluded that SLR's "claim should have been denied on April 13, 2010." Therefore, Hatch directed that "the claim be reopened and denied" because "[t]here is no

---

[2] It is unclear how Hatch reached the conclusion that CDR was not providing half of SLR's financial support. The only evidence in the record at that time would have been the sworn Statement Regarding Contributions signed by CDR and CAR. (ECF NO. 9 at 52–53). The Statement showed that CDR and CAR were the only individuals providing financial support to SLR, and further indicated that CDR was providing approximate two-thirds of SLR's financial support.

3

relationship established between [CDR] and [SLR]." Hatch's determination was communicated to CDR via letter also issued on June 10, 2015 (*Id*. at 57), in which CDR was advised that the June 9, 2015, determination of Lai was made "in error." CDR received more formal determination letters on June 26, 2015, August 17, 2015, and August 26, 2015, stating that SLR would not be paid monthly benefits going forward until the SSA was fully repaid $64,332.00 in overpayments.

On September 11, 2015, CAR filed a Request for Reconsideration (*Id*. at 71–74) on SLR's behalf. CAR supported the Request with a letter in which she reiterated that she and CDR were married on August 2, 1980, and had never been divorced. Although paternity had never been established by any formal testing, CAR asserted that CDR should be considered SLR's father under Indiana law due to the existence of the marriage at the time of SLR's birth. Also attached to the Request was a Wisconsin Certificate of Vital Record (*Id*. at 74) showing CDR as SLR's father. The SSA responded to the Request for Reconsideration via letter on October 6, 2015. (*Id.* at 78). The entirety of the factual basis for the SSA's decision was contained in the following sentence: "Since [Carl] and [CDR] both acknowledge [SLR] as being the biological child of [Carl], we should not have paid her any benefits on [CDR's] record." (*Id*.).

A Request for Hearing by Administrative Law Judge (*Id*. at 81) was filed on behalf of SLR on October 29, 2015. Pursuant to that Request an administrative hearing was held on August 19, 2016. The ALJ began the hearing by cautioning the witnesses not to dispute Carl's paternity. The ALJ stated:

> I just want to caution you, however. There is other evidence in this record that there were statements made to Social Security administration by both [CAR] and [CDR] and [Carl] that [Carl], in fact, was the biological father of [SLR].
>
> So before anyone's tempted to backtrack here and to contend that [Carl] is not the biological father of this child, I just want to make sure that everybody understands that there is evidence in this record already that statements were previously made

to the agency regarding [SLR's] biological father. Okay. You understand what I'm saying?

(*Id*. at 302). Despite giving this admonition, the ALJ's very first question for CAR was "[w]ho is the biological father of this child?" (*Id*.). CAR responded that she "honestly" did not know, explaining to the ALJ that she was having intercourse with both men at the same time. CAR admitted telling Hatch that she believed Carl was SLR's father, but she denied any recollection of CDR claiming that Carl was SLR's father. CAR explained that no testing had ever been done to determine SLR's parentage because "[CDR] just doesn't feel like it's necessary because it's his daughter as far as he's concerned." (*Id*. at 304). CAR further explained that she and SLR lived in a separate home from CDR because SLR's medical issues made it unsafe for her to live with CDR, who also experienced significant medical issues. (*Id*. at 305). Nonetheless, CAR confirmed that she and CDR had been married since 1980 and had never been divorced.

When asked about the relationship between Carl and SLR, CAR stated that Carl would assist with transporting SLR to medical appointments when he was in the area, but that CAR would always have to pay him. CAR testified that Carl "never" provided financial support for SLR. (*Id*. at 308). CDR, on the other hand, helped with "anything in any way that [CAR] need[ed] help." (*Id*. at 309). This included both financial and emotional support for SLR.

When CDR testified, he categorically and repeatedly denied telling the SSA that Carl was SLR's father. He testified that the SSA investigator aggressively questioned him about SLR's parentage – he stated she "pretty much beat me like a borrowed mule, got me whimpering like a puppy" – but denied ever stating that Carl was the father. (*Id*. at 317). CDR largely reiterated CAR's testimony regarding the living arrangements; SLR lived with CAR because his medical condition made it impossible for him to care for her.

5

Due to Carl's unavailability for the August 19, 2016, hearing, a supplemental hearing was held on February 22, 2017. The supplemental hearing was also set to give the ALJ an opportunity to take testimony from Hatch, but she was not available "because of an emergency in her family." (*Id*. at 340). The ALJ stated that her intention was to obtain testimony from Mrs. Hatch via interrogatory, a suggestion which drew an objection from CDR's counsel.

Carl, testifying via telephone, stated that he believed that he was SLR's father. He stated that SLR looked like him, and that he had spent considerable time with her after she was born due to SLR's various health issues. Carl confirmed that he did not provide any financial assistance for SLR but did state he provided emotional support to SLR. Carl admitted that he had never taken any official action to show that SLR was his child; he had not filed a paternity action, filed with the Indiana Putative Father Registry, requested a paternity test, listed SLR as a dependent on his taxes or other government filings, or had her covered on his health insurance. Carl further admitted that SLR had never lived with him. The ALJ repeated at the end of the hearing that she would be obtaining written responses from Mrs. Hatch to certain interrogatories. However, the record before the Court does not contain any such responses, so it is assumed that none were ever obtained.

The ALJ issued her Decision (*Id*. at 18–26) on May 31, 2017. The ALJ noted that although most of the evidence "favor[s] the allegations made by claimant's mother and [CDR] that [CDR] is the claimant's father (or at least do not bolster the allegations made by [Carl] that he is the claimant's father)," the ALJ found that the "record when viewed as a whole" supported the contention that Carl was the father. She noted that Carl, not CDR, was present for SLR's birth, stating that "if [CDR] was the claimant's father, he would have been present at her birth." (*Id*. at 23). Other pieces of evidence were also noted by the ALJ, including the fact that Carl spent some time with SLR, and that CAD had sexual intercourse with Carl around the time of SLR's

conception. However, the ALJ seemed to give the most weight to Hatch's note of the January 2015 meeting where CDR made the statement – disputed at the hearing – that Carl was SLR's father. The ALJ also believed that CAR and CDR's claim of CDR's paternity was made due to monetary interests, since the termination of SLR's benefits and the finding of the overpayment resulting in CAR receiving approximately $800.00 less per month. This was, according to the ALJ, "a compelling reason for the claimant's mother to continue arguing that the claimant is the child of [CDR], rather than [Carl]." (*Id*. at 24–25).

With respect to reopening the determination, the ALJ found Plaintiffs' claims "without merit." (*Id*. at 25). According to the ALJ, "the Social Security Administration may always make a new determination whenever a change occurs in the factual situation, regardless of how much time has elapsed from the date of that change, and that new determination is effective with the date of the change in the factual situation." (*Id*.). Since the ALJ determined that Carl was SLR's father, she determined that it was appropriate to make the change in SLR's benefits retroactive to birth.

## II. LEGAL ANALYSIS

A. *Legal Standard*

The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is eligible for benefits, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408 (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

B. *The ALJ Committed Legal Error in Reopening the Prior Determination*

The threshold issue before the Court is whether the SSA could reopen and revise its 2010 determination that SLR could collect benefits on CDR's earnings record. According to 20 C.F.R. § 404.987(b), the SSA may reopen a final determination on its own initiative, subject to the conditions set forth in 20 C.F.R. § 404.988. Section 404.988 sets different conditions for reopening a determination depending on the amount of time that has lapsed since the determination was made. A determination can be reopened for any reason within 12 months of the date of the notice of the initial determination. 20 C.F.R. § 404.988(a). The SSA can reopen a determination within four years of the initial determination for good cause. *Id*. at (b). "Good cause" is defined in 20 C.F.R. § 404.989 and includes: (1) new and material evidence; (2) a clerical error in the computation of benefits; or (3) "the evidence that was considered in making the determination or decision clearly shows on its face that an error was made." 20 C.F.R. § 404.989(a). Finally, the SSA may reopen a determination at any time under one or more of eleven identified conditions, including fraud, multiple claims on the same earnings record, and others. 20 C.F.R. § 404.988(c).

There does not appear to be any basis for reopening the initial determination here. As noted above, SLR began receiving benefits under CDR's earnings record in July 2010. She was not identified on Carl's application until December 2014. More than four years had expired since the initial determination, leaving only § 404.988(c) as an available avenue to reopen the case. The Court cannot find any exception from that subpart applicable here, and neither the ALJ nor the

8

SSA have identified one. Accordingly, the Court concludes that the initial determination could not have been reopened under the applicable regulations.

The Decision does not even recognize that a regulatory framework for reopening decisions exists. Instead, relying on Program Operations Manual System ("POMS") GN 03101.040, the ALJ simply declared that the SSA could make a new determination at any time "whenever a change occurs in the factual situation." (ECF No. 9 at 25). Plaintiffs spend a considerable amount of time in their Brief presenting argument that the identified POMS section should not apply[3] but the Court finds it unnecessary to wade into these interpretational waters. Simply put, the POMS manual has no legal force. *Parker for Lamon v. Sullivan*, 891 F.2d 185, 190 (7th Cir. 1989). Instead, it contains only the SSA's internal rules of procedure. *Schweiker v. Hanson*, 450 U.S. 896, 790 (1981). Therefore, nothing in the POMS can overcome the clear language of the regulations, and the ALJ erred in failing to consider the requirements set forth in the regulations.

Even if this Court believed it was bound by POMS, it would still find that the ALJ erred in reopening the initial determination. The triggering event for making a new determination under the identified POMS section is a change in the factual situation. Crediting all of the ALJ's findings, the only "changes" in the factual situation were: (1) the parties' claims that Carl might be SLR's father; (2) the disclosure of the sexual relationship between CAR and Carl; (3) Carl's minimal involvement in SLR's life; and (4) Carl's belief that SLR resembles him. However, the foregoing list has little, if any, bearing on the paternity of SLR. A passing resemblance and the belief of the parties are often wrong and fall far short of establishing paternity. The ALJ's decision to credit

---

[3] The SSA makes no response to Plaintiffs' legal arguments on this point. Accordingly, the Court will consider the SSA to have waived any challenge to Plaintiffs' interpretation of the relevant POMS provisions. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

these irrelevant pieces of evidence, particularly in the face of the legal presumption that CDR is SLR's father (Ind. Code § 31-14-7-1), is inexplicable.

The ALJ also fails to explain how she expected to overcome the *res judicata* effect of the prior determination. *Res judicata*, also known as claim preclusion, is an equitable doctrine that "bars claims that were litigated or could have been litigated in a previous proceeding." *Arrigo v. Link*, 836 F.3d 787, 798–99 (7th Cir. 2016). Put more simply, *res judicata* prevents a party from pursuing claims that he already brought, or at least already had the chance to bring. A party asserting *res judicata* or claim preclusion must establish: "(1) identity of the claim, (2) identity of parties, which includes those in 'privity' with the original parties, and (3) a final judgment on the merits." *Ross ex rel. Ross v. Board of Educ. of Twp. High Sch. Dist. 211*, 486 F.3d 279, 283 (7th Cir. 2007).

The first two elements are met here. We have the same parties (SLR and the SSA) and the same claim (SLR's entitlement to benefits under CDR's earnings history) as were present in the 2010 determination. While we do not have a "final judgment" as such, it is nonetheless established law in this Circuit that a benefits determination is subject to *res judicata*. *See Dugan v. Sullivan*, 957 F.2d 1384, 1387–88 (7th Cir. 1992). Therefore, *res judicata* applies, and all claims that were or could have been litigated as part of the prior determination, including SLR's paternity, are now barred from re-litigation.

Application of *res judicata* in this manner makes sense. Because errors can cause considerable hardship, the regulations should be liberally applied in favor of beneficiaries. *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975). The context of the present case also illustrates how the system can be procedurally stacked against a claimant. The SSA is able to enforce its termination retroactively. *See* 20 C.F.R. § 404.1594(g)(4). Here, the 2015 termination and

overpayment order was effective twelve years earlier—as of SLR's birth. But the claimant, who must reapply for benefits, cannot earn re-entitlement to benefits effective more than 12 months before her new application. *See* 20 C.F.R. § 404.621(a)(1)(i). The resulting gap highlights the special need for finality in the SSA's determinations. When a claimant is notified in 2015 that her benefits are terminated effective 2003, and she is unable to establish her re-entitlement before 2014 (even if she met the eligibility criteria in 2003), an eleven year gap in benefits is created by operation of law. By ensuring timely and final determinations, administrative *res judicata* can protect the claimant against substantial liability that might result from this scheme.

In summary, there was no legal or factual basis for the ALJ to reopen the 2010 determination on SLR's entitlement to benefits under CDR's earnings history. It is therefore unnecessary for this Court to examine the (flawed) factual analysis by the ALJ, and there is no basis upon which to remand this matter for further consideration. The only appropriate result is for this matter to be remanded with instructions to reinstate the initial determination, and that is what this Court will do.

## CONCLUSION

For the foregoing reasons, this Court REMANDS this matter with instructions to vacate the May 31, 2017, Decision, to reinstate the prior award of benefits based upon CDR's earnings record, and to vacate the overpayment. Defendant's Motion to Remand for Further Administrative Proceedings and Development under Sentence Four of 42 U.S.C. § 405(g) (ECF No. 17) is DENIED.

SO ORDERED on August 15, 2019.

        s/ Holly A. Brady
        JUDGE HOLLY A. BRADY
        UNITED STATES DISTRICT COURT